# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** _____ | **MDL 2724** **16-MD-2724** **HON. CYNTHIA M. RUFE** |
| **IN RE: URSODIOL CASES** _____ | **16-UR-27240** **16-UR-27242** |
| **FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INSURANCE TRUST FUND** **On behalf of itself and all others similarly situated,** **Plaintiff,** **vs.** | **Civil Action No.** **[XX]-cv-[XXXX]** |
| **ACTAVIS HOLDCO U.S., INC., LANNETT COMPANY, INC., and EPIC PHARMA, LLC,** **Defendants.** | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund ("FOP Miami" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust and consumer protection laws and the common law of unjust enrichment to recover damages and to obtain injunctive and equitable relief for the injuries it and others similarly situated have sustained against Actavis Holdco U.S., Inc. ("Actavis"), Lannett Company, Inc. ("Lannett") and Epic Pharma, LLC ("Epic") (collectively "Defendants") arising from their conspiracy to fix, raise, maintain and stabilize the prices of generic Ursodiol capsules ("Ursodiol") in the United States during the period of May 9, 2014

through the present or the date on which the anticompetitive effects subside (the "Class Period"), in the states and districts identified below, and to allocate markets and customers for those products during the same time period. All allegations herein are based on review of publicly available documents, counsel's investigation, Plaintiff's personal knowledge as to itself, and information and belief.

## NATURE OF THE ACTION

1.      Generic ursodiol, or ursodeoxycholic acid, in capsule form ("Ursodiol")[1] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines, and is prescribed for gallbladder stone dissolution.

2.      Generic versions of Ursodiol have been on the market since 2000, and prior to May 2014, the price of Ursodiol was relatively stable around $2 per unit. This was a direct result of competition spurred by the presence of various generic drugs, which benefit consumers and third-party payors through lower prices.

3.      Over the past three years, however, Ursodiol has seen unprecedented and astounding price increases. Since approximately May 2014, the average price of Ursodiol increased from roughly $2 per unit to between $6-$7 per unit, over 200%, in less than two months. Since that time, Defendants have maintained Ursodiol prices at these supracompetitive prices.

4.      The U.S. Government Accountability Office ("GAO") has noted that Ursodiol has experienced "extraordinary price increases" between 2014 and 2015.[2]

---

[1] As used herein, "ursodiol" refers to the drug generally, regardless of form. "Ursodiol" (with an upper case "U") refers specifically to the capsule form.
[2] *See* GAO, Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, No. 16-706, App'x III, p. 45 (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf.

5.    These price increases did not stem from competitive behavior caused by, for instance, supply shortages or changed product demand.  Rather, they were the scion of Defendants' broad and wide-ranging conspiracy to fix, raise, maintain and stabilize the prices of these products, and to allocate customers and markets for them.  Defendants effectuated their conspiracy by direct business-to-business contacts among generic drug manufacturers, secret communications and meetings, and/or joint participation taken under the guise of trade associations like the Generic Pharmaceutical Association ("GPhA").

6.    Beginning in May 2014, Defendants caused the price of Ursodiol to dramatically increase in lockstep.  These increases were the result of agreements among the Defendants to increase pricing, restrain competition and allocate the markets for the sale of Ursodiol in the United States.  These agreements were advanced by discussions held at GPhA conferences, including meetings held in Orlando, Florida in mid-February 2014, attended by Defendants Actavis and Epic – and continuing through June 2014 at a GPhA workshop held in Bethesda, Maryland attended by Defendants Actavis and Lannett, as well as other meetings and communications.

7.    As demonstrated below, Ursodiol price inflation was done lockstep with Defendants coordinating the skyrocketed price hikes during a roughly two-month period.



8.      The sudden and lockstep price increases of generic drugs have grabbed the attention of public officials.  The Department of Justice ("DOJ") and the Connecticut Attorney General's Office ("CTAG") have both issued subpoenas to as many as a dozen generic drug manufacturers concerning prices of at least two dozen drugs. The DOJ's subpoenas arose from a grand jury proceeding in this District that is investigating whether Defendants and other drug manufacturers conspired to fix generic drug prices.

9.      DOJ's and CTAG's investigations began in the summer of 2014, with both of these agencies issuing subpoenas to various generic drug manufacturers concerning anticompetitive practices in the generic pharmaceutical industry.

10.     Congress has taken notice of the price increases as well.  Rep. Elijah Cummings, Ranking Member of the House Committee on Oversight and Government Reform, and Sen. Bernie Sanders, Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, have each written letters to drug manufacturers to request information concerning their sales of other generic drugs that have experienced similar increases. Such drugs include digoxin, doxycycline, albuterol sulfate,

4

glycopyrrolate, divalproex sodium ER, neostigmine methylsulfate, and benazepril/hydrochlorothiazide.

11.    Numerous generic drug manufacturers received a letter from Senator Bernie Sanders and Congressman Elijah E. Cummings in October 2014 requesting information concerning their pricing of generic drugs.[3]

12.    Most recently, on December 12, 2016, the DOJ filed criminal informations against Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), respectively the former Chief Executive Officer and President of Heritage Pharmaceuticals, Inc.  These cases are both pending in this District and allege that these former senior executives of generic drug manufacturer, Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids, and allocate customers for generic glyburide and doxycycline hyclate sold in the United States."[4]

13.    On January 9, 2017, both Glazer and Malek pleaded guilty to the charges. Sentencing for both Glazer and Malek was originally set for April 2017, but was rescheduled for September 2017 as they continue to cooperate with the DOJ.  Evidence reportedly discovered in a related case shows that Malek compiled a large list of generic drugs and instructed his employees to contact competitors to agree to increase prices and allocate customers, and that some competitors were willing to agree to this conduct.

14.    The DOJ has intervened in numerous civil antitrust lawsuits alleging price fixing, bid rigging, and market allocation of generic pharmaceuticals due to the overlapping facts with

---

[3] These investigations concern generic drugs and Plaintiff reserves the right to amend its Complaint to add more parties and/or more claims as additional information is revealed.
[4] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action regarding the alleged price fixing of the drug propranolol, the DOJ has intervened and requested a stay, stating the "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Malek and Glazer] informations that were unsealed."[5]

15.     Additionally, on December 14, 2016, the attorneys general ("AG") of twenty states (later amended to include 40 state attorneys general) filed a complaint against multiple generic manufacturers of glyburide and doxycycline hyclate for conspiring to fix the prices and allocate the market for these medications.[6]

16.     Significantly, both the DOJ informations as well as the AG Complaint indicate that these actions by the generic manufacturers of doxycycline hyclate and glyburide were not isolated and limited to those drugs.  The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[7]

17.     The AG Complaint acknowledged that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[8]

---

[5] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF No. 112 (S.D.N.Y. Feb. 21, 2017).
[6] *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.).
[7] *Id*. at ¶9.
[8] *Id*. at ¶13.

18.    Recently, price increases for generic drugs, including Ursodiol, have also garnered scrutiny from the media as well.  FiercePharma has reported:

> One example is [U]rsodiol, a generic drug for gallstones produced by 8 drugmakers, including Mylan. Several years ago, the wholesale price ran as low as 45 cents a capsule. In May 2014, Lannett Co. (**$LCI**) bumped its price for [U]rsodiol to $5.10 a capsule, a price hike of more than 1,000%. Rather than keeping their own generic versions of [U]rsodiol low to steal market share, each competitor followed Lannett's lead and priced their versions the same or close.[9]

19.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of Ursodiol has caused and continues to cause consumers and third-party payors to pay supracompetitive prices for Ursodiol.

20.    Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is a national injunctive class of persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or the entire purchase price of generic Ursodiol, manufactured by Defendants during the Class Period.

21.    The second class (the "Damages Class") includes all persons or entities who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Ursodiol manufactured by Defendants during the Class Period in the states identified herein and the District of Columbia.

## JURISDICTION AND VENUE

22.    Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

---

[9] http://www.fiercepharma.com/pharma/some-generic-drug-prices-soar-despite-heavy-competition.

23.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in the Claims for Relief below.

24.     Pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. §26), and 28 U.S.C. § 1367, jurisdiction is conferred upon this Court.

25.     Pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d), venue is proper in this judicial district because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Therefore, it is likely that acts in furtherance of the alleged conspiracy took place here. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here.

26.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Ursodiol  throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## **PARTIES**

27.     Plaintiff FOP Miami is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was

established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care or benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW 2nd Avenue, Miami, Florida, and is a citizen of Florida. During the Class Period, FOP Miami purchased and paid for some or all of the purchase price for one or more Ursodiol prescriptions in Florida, thereby suffering injury to its business and property. FOP Miami paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

28.     Defendant Actavis is an Irish corporation with its global principal place of business in Dublin, Ireland and its U.S. administrative headquarters in Parsippany New Jersey. During the Class Period, Actavis sold Ursodiol to customers in this District and other locations in the United States.

29.     Defendant Lannett is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. During the Class Period, Lannett sold Ursodiol to customers in this District and other locations in the United States.

30.     Defendant Epic is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the Class Period, Epic sold Ursodiol to customers in this District and other locations in the United States.

31.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

32.     All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

33.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

34.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

35.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

36.     During the Class Period, Defendants sold substantial quantities of generic Ursodiol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

37.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, generic Ursodiol has been and is offered at higher prices to end-payors inside each respective state than they would have been or would be but for Defendants' conduct. The

complete lack of availability of competitive priced generic Ursodiol directly impacts and disrupts commerce for end-payors within each state.

38.    Defendants' conduct has had, and continues to have, a direct, substantial and reasonably foreseeable effect on both interstate commerce and on intrastate commerce in each Class state, including commerce in this District and state, and it will continue to do so if not constrained by the Court.

## FACTUAL ALLEGATIONS

### A.    Generic Drugs and the Pharmaceutical Industry

39.    Defendants manufacture and sell, *inter alia*, generic versions of branded drugs once any applicable patent on the branded drugs expires.

40.    Generic drugs are "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[10]  If the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[11] Generics in mature markets often cost as little as 10-15% of the branded drug's price.[12]

41.    Studies have shown that generic drugs' entrance onto the market can quickly erode a branded drug's market share – often 90% of the branded drug's sales. Per IMS Health data, generic drugs as of 2013 account for 86% of all drugs dispensed in the United States.[13]

---

[10] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.
[11] *Id.*
[12] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST. CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.
[13] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.



42. The more generic versions of a drug available on the market, the lower the prices that consumers and third-party payors have to pay. Each successive generic product in a competitive market lowers the price because each entry increases competition for sales and market share. In a competitive market, both the branded manufacturer and the older generic manufacturers lower prices in response to the new competitor, as the following FDA chart shows[14]:

---

[14] FDA, Generic Competition and Drug Prices,
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM) 1999-2004, extracted February 2005

43.    Accordingly, generic competition to a branded drug can provide billions of dollars in savings to consumers, pharmacies, other purchasers, private health insurers, health and welfare funds and state Medicaid programs, which reimburse drug purchases for their insureds. A GPhA study found that generic drugs saved the U.S. healthcare system $1.68 trillion between 2005 and 2014, including $254 billion in 2014 alone.[15]

44.    The great benefits of generic competition were recognized by Congress and memorialized with the enactment of the Drug Price and Patent Term Restoration Act of 1984, (the "Hatch-Waxman Act"). The Hatch-Waxman Act simplifies and sets out the regulatory hurdles with which generic drug manufacturers have to comply prior to marketing and selling generic drugs. For example, rather than having to file a lengthy New Drug Application ("NDA"), the Hatch-Waxman Act provides for a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") in order to obtain FDA approval.

---

[15] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.GPhAonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

45.     An ANDA applicant must show that its generic drug is bioequivalent to the brand drug, and the ANDA applicant can rely on the scientific and clinical data compiled by the Brand's NDA, including safety and efficacy data.  This reliance allows the generic company to forego duplicative and expensive experimentation and having to perform its own clinical trials.

46.     During the approval process, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX."  An "AB" rating signifies that the approved generic drug is therapeutically equivalent to its branded counterpart.

47.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally (and sometimes are legally required to) substitute a generic drug when consumers fill prescriptions for a branded drug. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents (AB rated) for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

**B.     Market for Generic Ursodiol**

48.     The market for generic Ursodiol is mature - it has been available on the generic market since 2000.  Hundreds of thousands of prescriptions for the drug were filled during the Class Period, with prescriptions (81.6% in 2015, based on 2015 sales figures) in the capsule form.[16] Therefore, Defendants must compete on price in order to gain market share.

---

[16] Based on 2015 sales figures, a significantly smaller percentage of ursodiol-22.4%-is sold in tablet form.  This less-pervasive form of ursodiol is principally manufactured or marketed by manufacturers other than Defendants here.  Significantly, the tablet form of ursodiol did not see the same price increase of Ursodiol that Defendants imposed on End-Payor purchasers alleged herein, indicating further that the prices here were the result of a conspiracy.

49.    Ursodiol is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and helps break down cholesterol that has formed into gallbladder stones.

50.    Defendants dominate the Ursodiol market.   In 2014, Actavis's Ursodiol sales exceeded $155.2 million, Lannett's Ursodiol sales for the same period exceeded $86.8 million, and Epic's Ursodiol sales for the same period, exceeded $60.7 million.   Ursodiol sales of roughly $5 million, or under 2% of the Ursodiol market, compared to Defendants' collective roughly 98.3% of the market, as depicted below:



Total 2014 Ursodiol Capsule Sales %

- ACTAVIS PHARMA  - LANNETT  - EPIC PHARMA LLC
- TAGI PHARMA  - ACTAVIS U.S. BR

51.    Prior to 2014, the average price for Ursodiol remained stable at around $2 per unit since at least as early as January 2011.   Then, following meetings attended by Defendants in February and June 2014, the average price of Ursodiol sharply rose during a two-month window.



52.    In stark contrast, during this same time period, the price movement of the less sought after, smaller market tablet form ursodiol presents a far different picture than the market-dominating Defendants' inflated capsule form of the drug.  In other words, the same molecule, "ursodeoxycholic acid," did not increase in price in this other form.  Significantly, Defendants generally do not produce the ursodiol tablet form:



### C.    Pricing of Ursodiol Inexplicably Rises

53.    The spike in Defendants' Ursodiol prices was dramatic and uniform.  At around May 1, 2014 Defendants' manufacturer list prices for Ursodiol (per unit) were:

| Manufacturer | 4/30/2014 |
|---|---|
| Epic | $0.45 |
| Actavis | $0.77 |
| Lannett | $0.77 |

54.    As shown below, as the conspiracy unfolded over the next two months, Defendants uniformly raised their Ursodiol list prices beginning in May 2014, and by late June 2014, Defendants' inflation of their Ursodiol list prices was complete:

| Manufacturer | 5/7/2014 | 5/14/2014 | 6/25/2014 |
|---|---|---|---|
| Epic | $0.45 | $5.10 | $5.10 |
| Actavis | $0.77 | $0.77 | $5.11 |
| Lannett | $0.77 | $5.11 | $5.11 |

55.    Defendants' list price inflation had a direct impact on Ursodiol's Average Wholesale price ("AWP"), which is the price at which pharmaceuticals are purchased at the wholesale level.   Indeed, the magnitude of Defendants' price inflation is undeniable, as illustrated below by the following Ursodiol AWP for each Defendant between April 30, 2014 and August 29, 2014:

| Manufacturer | 4/30/2014 | 5/30/2014 | 6/30/2014 | 7/31/2014 | 8/29/2014 |
|---|---|---|---|---|---|
| Epic | $2.01 | $5.22 | $5.93 | $6.43 | $6.49 |
| Actavis | $2.28 | $2.23 | $4.54 | $6.96 | $6.96 |
| Lannett | $1.91 | $1.92 | $2.69 | $6.04 | $6.19 |

### D.    No Market Based Reasons Exist For Price Increases

56.    There are no reasonable justifications for this sudden shift in pricing of Ursodiol. One potential reason prices might increase could be a supply disruption or shortage, but there

was no such disruption or shortage related to ursodeoxycholic acid prior to, after or during mid-2014.   The FDA reported no ursodeoxycholic acid shortages, there was no new patent or formulation, no labeling changes and once in production, ursodeoxycholic acid is not difficult to make.   There has been no meaningful explanation for the coordinated price increase.   Notably, there were no similar price hikes of Ursodiol in other countries, including, for example, in the United Kingdom, Denmark or Norway.   Ursodiol prices have remained consistent in those countries as demonstrated below:



57.     Any justifications for the price increases would be pretextual.

**E.     Governmental Responses and Defendants' Corporate Filings**

58.     As noted above, during approximately this same period of time that Ursodiol prices increased, prices for a number of other generic drugs also increased dramatically.   For example, the price of a generic antibiotic, doxycycline rose 8,281% between October 2013 and April 2014.[17]

59.     Due to the skyrocketing increase in this and other generic prices, Congress and state governments each began inquiries into numerous generic drug manufacturers' actions. The pricing data and other evidence resulted from these investigations.

---

[17] http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

60.    According to SEC filings by Lannett, on November 3, 2014, the DOJ served the company's Senior Vice President of Sales and Marketing with a grand jury subpoena relating to the DOJ's generic pharmaceutical industry investigation.  According to Lannett, the investigation is specifically looking "into possible violations of the Sherman Act" and requests "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any time period."[18]

61.    Likewise, on June 25, 2015, according to its SEC filing, Actavis received a DOJ Antitrust Division subpoena that seeks "information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products.[19]

62.    The fact that Defendants and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.[20]   Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82.  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney

---

[18] file:///C:/Users/jayne/Downloads/LCI%20(Lannett%20Co.%20Inc.)%20%20(10-Q)%202014-11-06.pdf at p. 16.
[19] https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm at p. 64.
[20] *Available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that one or more of the Defendants and certain of their employees received federal grand jury subpoenas is an indication that antitrust offenses have occurred.

63.    The issue of skyrocketing generic drug prices is of great importance.  In addition to the DOJ subpoenas, Congress has taken notice and interest in the rising costs of generic drugs, holding hearings and calling for investigations.

64.    Sen. Sanders and Rep. Cummings held a hearing in November 2014 to discuss that generic drugs had recently spiked in price, putting a drain on consumers' budgets.

65.    After Sen. Sanders held a Senate hearing, on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG"). They asked OIG to investigate how Defendants' price increases affected spending in the Medicare and Medicaid programming.[21]  OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[22]

66.    On the state level, Connecticut Attorney General George Jepsen issued subpoenas to numerous generic manufacturers in July 2014, on the basis that there was reason to believe that generic manufacturers engaged in a conspiracy which "has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories…"[23]

---

[21] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.
[22] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.
[23] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG,

67.    As previously stated, the DOJ also launched a probe into alleged price-fixing among generic manufacturers. In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax Laboratories, Inc. was the first to disclose having received a subpoena.[24] Additional subpoenas were issued in May 2016, and there may be additional ones issued.

68.    To date, numerous generic drug companies have been contacted in connection with both federal and state antitrust probes into pricing practices in the generic pharmaceuticals market, including: Taro, Sandoz, **Actavis,** Citron, Teva, **Lannett**, Impax, Par, Mylan, Sun, Dr. Reddy's, Mayne, and Zydus.

69.    The fact that a target has applied for leniency is also significant.  As noted on the DOJ website (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes.  The Division's leniency policies were established for corporations and individuals 'reporting their illegal antitrust activity,' and the policies protect leniency recipients from criminal conviction.  Thus, the applicant must admit its participation in the criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

---

http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html.
[24] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

70.     As noted above, on December 12, 2016, the DOJ filed criminal informations against Glazer and Malek.

71.     A press release issued by DOJ in conjunction with these filings stated:

> Millions of Americans rely on prescription medications to treat acute and chronic health conditions. By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion.

> Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division. "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law.

> Today's charges are the result of an **ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry**, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[25]

---

[25] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

(emphasis added)

72.    Also, as noted above, on December 14, 2016, the attorneys general ("AG") of twenty states (amended to now include forty state attorneys general) filed a complaint against multiple generic manufacturers of doxycycline hyclate and glyburide for conspiring to fix the prices and allocate the market for these medications.[26]

73.    Significantly, both the DOJ press release, as well as the AG Complaint, indicate that these actions by the generic manufacturers of doxycycline hyclate and glyburide were not isolated and limited to those medications.  The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[27]

74.    Connecticut's Attorney General George C. Jepsen commented on the suit that:

> We believe this is just the tip of the iceberg.  I stress that our investigation is continuing, and goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit.[28]

**F.    Meetings at Trade Shows Facilitated Defendants' Schemes**

75.    The structure of the generic drug market allows generic drug manufacturers, including Defendants, to frequently interact and directly communicate with each other.  According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by a prosecutor involved with the government's generic pricing investigation said the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."  The

---

[26] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 VLB (D. Conn.).
[27] *Id*. at ¶9.
[28] Katie Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, The New York Times (Dec. 15, 2016), *available at* http://www.newyorktimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html.

subpoena issued to Lannett focuses on "communications or correspondence with competitors regarding the sale of generic prescription medications."

76.    The prices for over a thousand generic pharmaceuticals skyrocketed between 2013 and 2014.  One report claims that "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[29] During this same time period, Defendants met and frequently interacted at industry trade shows and multi-day conferences, including those hosted by the GPhA, the National Association of Chain Drug Stores, Healthcare Distribution Alliance and Efficient Collaborative Retail Marketing, among others.  These trade shows and conferences afford Defendants the ability to interact with each other and discuss their respective businesses and customers and are provided opportunity to discuss and implement various anticompetitive schemes to restrain competition in the generic drug market.

77.    Defendants regularly met at GPhA meetings in and around the Class Period.  On February 19-21, 2014 Actavis and Epic attended the GPhA's multi-day annual meeting in Orlando, Florida.  Actavis and Lannett also met for two days on June 3-4, 2014 in Bethesda, Maryland at a GPhA workshop.  As noted above, the prices of Ursodiol skyrocketed in lockstep after those meetings.

### G.    The Ursodiol Generic Drug Market is Susceptible to Collusion

78.    In addition to the pricing allegations set forth above, many market and other relevant factors give rise to a reasonable inference that Defendants illegally acted in concert to raise and fix Ursodiol prices at supracompetivie levels in the United States.  The United States generic Ursodiol market displays various qualities that place it at risk of collusion and other

---

[29] Gillian Mohney, *Generic Drug Price Sticker Shock Prompts Probe by Congress*, ABC News, Nov. 21, 2014.

anticompetitive behavior. Such qualities include: (1) high concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire.

**Concentration in the Market.**

79.    Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct. The market for Ursodiol is highly concentrated. Defendants each possess large market shares in their respective markets. Only a handful of competitors exist in each market.

80.    The limited number of manufacturers in this market facilitated Defendants' ability to coordinate prices of their generic drugs.

81.    The market for Ursodiol is mature and Defendants can only compete on price in order to gain market share.

**High Barriers to Entry.**

82.    Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion. However, when a market has high barriers to entry, new competitors are less likely to enter the market. Accordingly, high barriers to entry facilitate collusive behavior.

83.    The market for generic Ursodiol has high barriers to entry, including regulatory, intellectual property and financial hurdles.

84.    All generic drug manufacturers must receive FDA approval prior to marketing and selling products. FDA approval requires, *inter alia*, the preparation and filing of an ANDA, which typically costs at least $1 million.[30]

85.    Further, both state and federal law govern the operation of drug manufacturing facilities. Such costs of doing business are another regulatory barrier to entry for potential competitors.

86.    Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act.  Transactional costs such as licensing deals can add further layers of costs.

87.    Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

88.    The small number of competitors in the generic Ursodiol market reflects these high barriers to entry.

**Inelastic Demand.**

89.    In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other.  Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes. When price elasticity of demand is

---

[30] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.

inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases. Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

90.    Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, which is necessary for survival. Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

91.    Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Ursodiol, as the market for the drug displays a price inelasticity of demand.

### Lack of Available Product Substitutes.

92.    Patients that require the use of Ursodiol, do so because they are suffering from gallstones and require Ursodiol. These individuals must take either brand name Ursodiol products or generic alternatives. Historically the brand name alternatives cost more than generic alternative, even at artificially inflated levels.

### Opportunities to Conspire.

93.    Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete.

94.    Additionally, as discussed above, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers. Recreational and social

events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with competitors away from the usual business setting. Defendants' representatives use these functions to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

95.     The DOJ's grand jury subpoenas and informations also indicate that communication between Defendants was prevalent at such meetings and conferences. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[31]

## ANTITRUST EFFECTS AND VIOLATIONS

96.     During the Class Period, Plaintiff and Damages Class Members purchased substantial amounts of Ursodiol indirectly from Defendants. Because of Defendants' illegal conduct set forth herein, the End-Payor purchasers have paid, and are still paying, artificially and substantially inflated prices for Ursodiol.

97.     Plaintiff and Damages Class Members have sustained substantial losses and resultant damage to their business and property in the form of overcharges. These losses and damages will continue to accrue until the anticompetitive conduct set forth herein ceases. The full amount of such damages will be determined at trial.

98.     These losses are caused directly by Defendants' anticompetitive conduct, which had at least the following effects:

---

[31] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

    a.      Price competition in the market for generic Ursodiol has been artificially restrained, suppressed or eliminated in the United States;

    b.      Prices for generic Ursodiol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

    c.      Purchasers of generic Ursodiol from Defendants have been deprived of the benefit of free and open competition in the market for generic Ursodiol.

99.      At all relevant times, Defendants sold Ursodiol within the continuous and uninterrupted flow of interstate commerce. Defendants transmitted invoices, contracts, funds and other forms of business communication throughout this time.

100.    The pricing and regulation in the generic drugs industry means that overcharges at higher levels of the distribution chain get passed down to end-payors such as Plaintiff and Damages Class Members. Wholesalers and retailers who incurred higher charges for Ursodiol due to Defendants' behavior simply passed on those charges to the indirect purchasers.

101.    During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of Ursodiol in the United States.

102.    In forming, effectuating and operating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Ursodiol sold in the United States. These activities include the following:

    a.      Defendants met in person or telephonically to discuss the price of generic Ursodiol in the United States;

    b.      Defendants agreed during those meetings and conversations to charge set prices and otherwise to increase or maintain prices of generic Ursodiol sold in the United States;

    c.    Defendants agreed during those meetings and conversations to fix the price and/or allocate the market of generic Ursodiol;

    d.    Defendants issued price announcements in accordance with their agreements; and

    e.    Defendants actually set prices in accordance with their agreements.

103.    Defendants' anticompetitive behavior allowed them to charge the purchasing public prices higher than what they would have been able to charge otherwise.

104.    Inflated prices for consumers purchasing Ursodiol were a direct, traceable and foreseeable result of Defendants' conspiracy.

105.    Plaintiff and Damages Class Members indirectly purchased generic Ursodiol from Defendants or their affiliates or co-conspirators at inflated, supracompetitive prices during the period of the conspiracy.

106.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the laws of various states.

107.    But for Defendants' anticompetitive conduct, Plaintiff and Damages Class Members would not have paid these inflated prices. Accordingly, Plaintiff and Damages Class Members have been injured in their business and property in that they paid more for generic Ursodiol than they would have paid in a competitive market.

## CLASS ALLEGATIONS

108.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All persons and entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of

the purchase price for any one of Defendants' Ursodiol capsules during the Class Period, which runs from May 9, 2014, through the present or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Ursodiol products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Ursodiol products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers and (g) any judges or justices involved in this action and any members of their immediate families.

109.   Plaintiff also brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States") on behalf of the following class (the "Damages Class"):

All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price for any one of Defendants' Ursodiol capsules during the Class Period, which runs from May 9, 2014, through the present or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Ursodiol products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Ursodiol products were paid in part by a third party payor and whose co-payment was the same regardless of the

retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

110.    The Nationwide Class and the Damages Class are herein referred to as the "Classes." Members of each Class may be referred to as "Class Members."

111.    The Classes are each individually sufficiently numerous. Plaintiff believes there are hundreds of thousands, if not millions, of members in each Class, in an amount to be determined in discovery and at trial. The identities of Class Members will be readily ascertainable through business records kept in regular order.

112.    Common questions of law and fact exist as to all Class Members. The effects of Defendants' conspiracy were generally applicable to all Class Members, thereby making relief appropriate with respect to the Classes as a whole. Such questions of law and fact common to the Classes include but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Ursodiol;

b.    Whether Defendants and their co-conspirators allocated markets for customers for generic Ursodiol sold in the United States;

c.    Whether Defendants' conduct harmed competition in the market for generic Ursodiol;

d.    Whether Defendants' conduct has substantially affected interstate and intrastate commerce;

e.    Whether, and to what extent, Defendants' conduct caused and/or is causing antitrust injury to the business or property of Plaintiff and Damages Class Members in the nature of overcharges;

f.    The quantum of overcharges paid by Plaintiff and Damages Class Members;

g.    The participants in the alleged conspiracy;

h.    The duration of the alleged conspiracy;

i.    The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

j.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

k.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second Claim for Relief;

l.    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the Class Members, thereby entitling Plaintiff and the Class Members to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

m.    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

n.    The effect of the alleged conspiracy on the prices of generic Ursodiol sold in the United States during the Class Period;

o.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

p.    The appropriate class-wide measure of damages for the Damages Class.

113.    Plaintiff's claims are typical of the claims of the Class Members. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all Class Members are all affected by Defendants' wrongful conduct in the same way, in that they paid artificially inflated prices for generic Ursodiol purchased indirectly from the Defendants and/or their co-conspirators.

114.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class Members. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class Members. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

115.   The questions of law and fact common to Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

116.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities located throughout the United States to prosecute common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining relief for claims that could not practicably be pursued individually, substantially outweigh any difficulties that may arise in management of this class action.

117.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### FIRST CLAIM FOR RELIEF
**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff and the Nationwide Class)**

118.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

119.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 and Section 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

120.   The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

121.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Ursodiol, thereby creating anticompetitive effects in the markets therefor.

122.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for generic Ursodiol.

123.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Ursodiol have been harmed by being forced to pay inflated, supracompetitive prices for generic Ursodiol.

124.    In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

125.    Defendants' conspiracy had the following effects, among others:

a.    Price competition in the market for generic Ursodiol has been artificially restrained, suppressed or eliminated in the United States;

b.    Defendants' prices for generic Ursodiol have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.    Purchasers of generic Ursodiol from Defendants have been deprived of the benefit of free and open competition in the market for generic Ursodiol.

126.    Plaintiff and members of the Nationwide Class have been and will continue to be injured in their business and property by paying more for generic Ursodiol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

127.    The alleged contract, combination or conspiracy violates the federal antitrust laws, including the Sherman Act.

128.    Plaintiff and members of the Nationwide Class are entitled to injunctive relief, preventing and restraining Defendants from committing the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

129.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

130.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Ursodiol in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

131.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic Ursodiol and to allocate customers for generic Ursodiol in the United States.

132.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Ursodiol at specified levels, and otherwise to fix, increase, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Ursodiol provided in the United States; and (b) participating in meetings and conversations among themselves in the United States to implement, adhere to, and enforce their unlawful agreements.

133.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Ursodiol.

134.    Defendants' knowingly and willfully carried out the anticompetitive acts described above. There was and is no legitimate, non-pretextual, procompetitive business justification for Defendants' contract, conspiracy or combination that outweighs its harmful effects. Accordingly, these acts constitute violations or flagrant violations of the antitrust laws of various states.

135.    Alternatively, during at least the Class Period, there has been a gross disparity between the price that Plaintiff and Damages Class Members paid for generic Ursodiol compared to what they would have paid under competitive market conditions, which should and would have been present but for Defendants' unlawful and inequitable conduct.

136.    Said disparity was a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, from which Plaintiff and Damages Class Members were deprived of the opportunity to purchase competitively priced Ursodiol from Defendants and were forced to pay higher prices for generic Ursodiol than they otherwise would have paid.

137.    Accordingly, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state antitrust and/or consumer protection statutes.

138.    By engaging the foregoing conduct, Defendants have threatened the business or property of Plaintiff and thus violated the antitrust laws of various states, and/or they have participated in unfair competition or unfair or deceptive acts or practices in violation of state

unfair and deceptive trade practices and consumer protection statutes of various states, both of which are listed herein:

a.   Ala. Code §§ 8-10-1 and 6-5-60(a), with respect to purchases in Alabama by Damages Class Members;

b.   Ariz. Rev. Stat. 44-1401, *et seq.*, with respect to purchases in Arizona Damages Class Members;

c.   Cal. Bus. & Prof. Code § 16700 *et seq.*, with respect to purchases in California by Damages Class Members;

d.   D.C. Code § 28-4501 *et seq.*, with respect to purchases in the District of Columbia by Damages Class Members;

e.   Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class Members;

f.   Haw. Rev. Stat. § 480 *et seq.*, with respect to purchases in Hawaii by Damages Class Members;

g.   Iowa Code § 553 *et seq.*, with respect to purchases in Iowa Damages Class Members;

h.   Kan. Stat. Ann. § 50-101 *et seq.*, with respect to purchases in Kansas by Damages Class Members;

i.   Me. Rev. Stat. Ann. Tit. 10, § 1101 *et seq.*, with respect to purchases in Maine by Damages Class Members;

j.   Mich. Comp. Laws § 445.772 *et seq.*, with respect to purchases in Michigan by Damages Class Members;

k.   Minn. Stat. § 325D.49 *et seq.*, with respect to purchases in Minnesota by Damages Class Members;

l.   Miss. Code Ann. § 75-21-1(a) *et seq.*, with respect to purchases in Mississippi by Damages Class Members;

m.   Mo. Rev. Stat. § 407.020, *et seq.*, with respect to purchases in Missouri by Damages Class Members;

n.   Neb. Rev. Stat. § 59-801 *et seq.*, with respect to purchases in Nebraska by Damages Class Members;

o.    Nev. Rev. Stat. Ann. § 598A *et seq.*, with respect to purchases in Nevada by Damages Class Members, in that at least thousands of sales of Defendants' PSPs took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct;

p.    N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members;

q.    N.M. Stat. Ann. § 57-1-1 *et seq.*, with respect to purchases in New Mexico by members of the Class;

r.    N.Y. Gen. Bus. Law § 340 *et seq.*, with respect to purchases in New York by Damages Class Members;

s.    N.D. Cent. Code § 51-08.1-01 *et seq.* with respect to purchases in North Dakota by Damages Class Members;

t.    Or. Rev. Stat. § 646.705 *et seq.*, with respect to purchases in Oregon by Damages Class Members;

u.    73 P.S. 201-1, *et seq.*, with respect to purchases in Pennsylvania by Damages Class Members;

v.    R.I. Gen. Laws § 6-36-11(a), with respect to purchases in Rhode Island by Damages Class Members;

w.    S.D. Codified Laws § 37-1 *et seq.*, with respect to purchases in South Dakota by Damages Class Members;

x.    Utah Code Ann. § 76-10-3101 *et seq.*, with respect to purchases in Utah by Damages Class Members who are either Utah residents or Utah citizens;

y.    Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont by Damages Class Members; and

z.    Wis. Stat. § 133.01 *et seq.*, with respect to purchases in Wisconsin by Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for generic digoxin and/or doxycycline in Wisconsin.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiff and the Damages Class)

139.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

140.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

141.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Ursodiol.

142.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for generic Ursodiol.

143.    Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Damages Class Members.

144.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic Ursodiol manufactured by Defendants during the Class Period.

145.    It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Ursodiol, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

146.    The economic benefit Defendants derived from overcharging Plaintiff and Damages Class Members for generic Ursodiol is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

147.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Damages Class Members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

148.    It would be inequitable under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for generic Ursodiol that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

149.    Defendants are aware of and appreciate the benefits that Plaintiff and the Damages Class Members have bestowed upon them.

150.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members, who collectively have no adequate remedy at law.

151.    Plaintiff and Damages Class Members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Damages Class Members may make claims on a *pro rata* basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes demands judgment that:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein;

C. Plaintiff and Damages Class Members recover damages, to the maximum extent allowed under such laws, and that joint and several liability be found to accrue against Defendants in an amount to be trebled to the extent such laws permit;

D. Plaintiff and Damages Class Members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect;

F.    Plaintiff and Damages Class Members be awarded restitution, including disgorgement and restitution of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

G.    Plaintiff and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.    Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.    Plaintiff and the Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  June 2, 2017                    Respectfully submitted,

                                        **SHEPHERD FINKELMAN MILLER**
                                        **& SHAH, LLP**

                                        By: */s/Jayne A. Goldstein*
                                        Jayne A. Goldstein (PA Bar No. 48048)
                                        Natalie Finkelman Bennett (PA Bar No. 57197)
                                        35 East State Street
                                        Media, PA 19063
                                        Tel: 610-891-9880
                                        Fax:  866-300-7367
                                        Email:  jgoldstein@sfmslaw.com
                                                nfinkelman@sfmslaw.com

**FINE, KAPLAN AND BLACK, R.P.C.**
Roberta D. Liebenberg
Paul Costa
Adam J. Pessin
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: 215-567-6565
Fax: 215-568-5872
Email:  rliebenberg@finekaplan.com
           pcosta@finekaplan.com
           apessin@finekaplan.com

**LABATON SUCHAROW LLP**
Gregory S. Asciolla
140 Broadway
New York, NY  10005
Tel: 212-907-0700
Fax: 212-818-0477
Email:  gasciolla@labaton.com

*Attorneys for Plaintiff, Fraternal*
*Order of Police, Miami Lodge 20,*
*Insurance Trust Fund*